SCHNEIDER, TRUSTEE, *v.* DORR ET AL.

(Guardian's Docket 2, No. 212—Decided January 12, 1965.)

*Messrs. Henderson, Quail, Schneider & Pierce* and *Mr. Charles P. Baker, Jr.*, for plaintiff, Hubert H. Schneider, Successor Trustee under the Will of Harrison T. Chandler, deceased.

*Messrs. Baker, Hostetler & Patterson*, for defendant, Western Reserve University.

*Messrs. Arter, Hadden, Wykoff & Van Duzer*, for defendants, St. Luke's Hospital Association of Cleveland, Ohio, of The Methodist Church, St. Vincent Charity Hospital, The University Hospitals of Cleveland, Josephine Louise Ott, Marella Agnelli, Nicola Caracciolo, and Carlo Caracciolo.

*Mr. Edward J. Schweid*, for defendant, The Woman's Hospital.

*Messrs. McAfee, Hanning, Newcomer, Hazlett & Wheeler*, for defendant, Fairview Park Hospital.

*Messrs. Squire, Sanders & Dempsey*, for defendants, Louise Shaw Dorr, The Cleveland Trust Co. under the Will of David W. Frackelton, deceased, Mary Louise Gleason and Caroline Elizabeth Moak.

*Messrs. Sayre, Vail & Steele*, for Richard C. Renkert, Trustee for Suit for All Unborn Persons.

106

*Messrs. Parks & Eisele,* for Ebert Weidner, Guardian Ad Litem for defendants, Charles Jack Dyer, Jr., Paul Albert Dyer and Mary Virginia Dyer.

*Messrs. Ford, Clarke, Howland, Whitney & Haase,* for William X. Haase, Guardian Ad Litem for defendants, John Charles Calkins and Rosemarie Calkins.

*Mr. William B. Saxbe,* attorney general, for himself, by *Miss Neva H. Wertz.*

*Messrs. Thompson, Hine & Flory,* for defendants, Dr. Harrison D. Huggins, Chester C. Huggins, Frederick S. Haines, III, Ida Marie Haines, Cordelia S. McGuire, Paul Dyer, Ruth M. Slack, Annie Laurie Lewis, Helen Hedrich, Ruth Huggins Hollister and Charles N. Huggins, Jr., and with Mr. Robert A. Wallis, for defendant Arline J. Dyer individually and as Administratrix of the estate of Francis Bernard Dyer and for Anna Marea Shaw.

*Messrs. Baker & Baker,* for defendants, Georgia E. Dyer and Ann Dyer Robertson.

*Messrs. Ulmer, Berne, Laronge, Glickman & Curtis,* for defendants, John Chandler Dyer and Francis Bernard Dyer, Jr.

*Messrs. Hahn, Loeser, Freedheim, Dean & Wellman,* for defendants, William B. Ewing IV and Hazel Ewing.

*Messrs. Green & Byrnes,* for defendant, William Julian Calkins.

*Mr. Ross G. Sweet,* for defendant, Josephine Chandler Horner.

*Prince Filippo Caracciolo Di Castagneto,* for himself.

*Mr. William Franklin Calkins,* for himself.

*Mr. Frank C. Mayne, Jr.,* Successor Trustee under the Will of Margaret Clark Caracciolo Di Castagneto, deceased, for himself.

*Virginia Dyer Dundas,* for herself.

POLLOCK, J. This is an action for a declaratory judgment brought by Hubert H. Schneider, as successor trustee under the will of Harrison T. Chandler, deceased, to determine the disposition of the corpus of the trust estate created by his will. All proper and necessary parties to this determination have been named defendants and are properly before the court.

The testator's will, dated February 15, 1904, a

codicil, dated January 19, 1905, and a second codicil, dated October 18, 1910, were duly admitted to probate in this court, following the testator's death on January 1, 1912, at the age of 69. All parties, through counsel, have signed an agreed statement of facts, or have failed to do so, although given full opportunity, upon proper notice thereof. A few supplemental facts were admitted on hearing by consent of all counsel present.

Approximately two-thirds of the assets in the estate were distributed to the distributees named in the will, the major portion going to his wife. The other one-third passed into a trust provided for by items 6 through 10 of his will. The assets coming into the trust were inventoried at $360,400.00 and consisted of stock in three corporations in which Mr. Chandler was the dominant figure, the most important one being The Chandler and Price Company. The stock in the two minor corporations have been sold by the trustee but the trustee still holds the Chandler and Price Co. stock and the trust has now grown to have a value of approximately $2,000,000.00.

Mr. Chandler was survived by his wife, Ellen F. Chandler, who died February 8, 1912, a month and eight days after her husband, and left her entire estate to their two daughters, Gertrude L. C. Tucker, who died March 25, 1953, and Constance Chandler Frackelton, who died May 1, 1963. Gertrude died without issue or surviving spouse and left her entire residuary estate to Western Reserve University. Constance also died without issue or surviving spouse and left her entire residuary estate to five local hospitals, which are defendants in this proceeding.

The trust provisions of Mr. Chandler's will are found in items 6 through 10 of which items 9 and 10 are most important to this action. They read as follows:

"Item 9. If after the death of my said wife and both of my said daughters there shall be a child or children of/either or both of my said daughters, who shall survive my said wife and both my said daughters for a period of ten (10) years, then and in that event I give, bequeath and devise to such child or children, each, all and every of said stocks, moneys, or re-invested property or securities, and all of the property left, provided hereby to go into the possession and control of said Ro-

bert J. Frackelton and his successors, to such child or children, to it or them and to its or their heirs and assigns forever, in the following proportions: If each of my said daughters shall leave a child or children who shall survive until ten (10) years after the death of my said wife, and both of my said daughters, then the child or children of my said daughter Gertrude L. C. Tucker shall take one-half thereof, and the child or children or of my said daughter Constance L. Chandler shall take one-half thereof. And in the event that either of my said daughters shall leave issue which shall not survive to the end of said period of ten years from and after the death of my said wife and both my said daughters, then if the other daughter shall have left issue which shall so survive, then the child or children of such daughter as shall survive, shall receive the entire property so left in trust, with any unpaid income thereof, to it or them and to its or their heirs and assigns forever. And in the event of the death of my said wife and of both of my said daughters, without issue of my said daughters, or of either of them, living at the end of said period of ten years after the death of my wife and daughters as aforesaid, then and in that case, I give, devise and bequeath unto my sister, Mary J. H. Shaw, of Petersburg, Illinois, to her and her heirs forever, one-fourth of said property, moneys and stocks described in Items 6 and 7 hereof; and to my nieces Clarissa C. Frackelton and Louise Frackelton, the daughters of my sister, Marie Louise Frackelton (of Petersburg, Illinois), deceased, share and share alike, one-fourth of the said property, moneys and stocks, described in Items 6 and 7 hereof; and one-fourth of said trust properties, moneys and unpaid income, I hereby give and bequeath to my brother Charles E. Chandler, of Peoria, Illinois, his heirs and assigns forever; and the remaining one-fourth of said trust properties and moneys and unpaid income, I hereby give and bequeath, share and share alike, to the then living lineal descendants of my brothers John T. Chandler and Linas C. Chandler, their heirs and assigns forever.

"Item 10. The object and purpose of the trust herein created being to provide an income assuring my wife and daughters an annual income which shall protect them against adversity and want, and to keep the said property named and described in Items 6 and 7 in persons of my own blood, as here-

tofore provided, and to the end that the same shall not descend to the husbands of my said daughters, nor be controlled by them or either of them, I direct that the husband of either of my said daughters shall not, at my death, or at any time thereafter, become a trustee of the property and funds herein described and provided for."

Item 12 gives to his wife and two daughters, "share and share alike, to them, their heirs and assigns forever, all the remainder of my property of every kind and nature * * *."

The first codicil is unimportant here. Items 2 and 3 of the second codicil, dated October 18, 1910, contain the following provisions.

"ITEM TWO (2) By Item Ten (10) of my said Will I provided that the husbands of either of my said daughters Gertrude and Constance should not become a Trustee of said trust property provided for in said Will. At this time my daughter Constance was unmarried. Since making said Will she has married said Robert J. Frackelton. I therefore modify and revoke said Item Ten (10) of my said will and Item Twelve (12) of my said Will, so far as they relate to the husband of said daughter Constance.

"ITEM THREE (3) If by reason of death or from other cause, any portion of said trust estate shall not be finally disposed of under said Will and this Codicil, then, and in that event it is my will that the same pass into my residuary estate provided by Item Twelve (12) of my said Will, to my said wife and daughters share and share alike, to them their heirs and assigns forever."

The main controversy in the case revolves around the issue as to whether item 3 of the codicil was designed by the testator to prevent the operation of the anti-lapse statute Section 10581, General Code (now Section 2107.52, Revised Code). If this is decided in the negative, the question next in importance is whether the provisions of item 9 require the distribution of the corpus of the trust to be delayed for ten years after the death of the last life tenant, which occurred on May 1, 1963. Then, if it should be held that the anti-lapse statute governs the distribution of the corpus so that it goes to his heirs rather than the university and hospitals, hereafter referred to as the charities, under the residuary clauses in the wills of decedent's

two daughters, a number of questions arise, such as the time of vesting, the effect of adoption of various children and whether the corpus descends per capita or per stirpes in some cases.

ISSUE 1.

Did the testator intend by item 3 of his second codicil to defeat the operation of the anti-lapse statute?

In item 9 of his will the testator provided that in the event of the death of his wife and both daughters, without issue surviving, "then and in that event, I give and devise and bequeath" the corpus of the trust to members of his family as follows: one-fourth to his sister Mary J. H. Shaw; one-fourth to Clarissa C. Frackelton and Louise Frackelton, daughters of his sister Marie Louise Frackelton, deceased; one-fourth to his brother Charles Chandler, and the remaining one-fourth to the then living decendants of his brothers (half-brothers) John T. Chandler and Linas C. Chandler. Item 10 quoted above indicated that he wished to provide an adequate income for his wife and daughters and to keep the trust property in persons of his own blood.

None of the persons specifically named in item 9 survived Constance, the last life tenant, and in fact, his sister and brother both died before the testator. Mary died in 1908, Charles in 1910 and the testator on January 1, 1912. Furthermore, although both Mary and Charles left issue surviving the testator, none of said issue survived the last life tenant, Constance. The two nieces survived the testator but not the life tenant and in the case of the half-brothers, none of their children survived Constance.

The charities base their contention that the testator intended to nullify the operation of the anti-lapse statute on several points, which include the following:

1. The testator intended to keep the trust estate in persons of his "own blood," meaning his children and grandchildren and not his collateral heirs.

2. When he executed his Codicil in 1910, his sister Mary and brother Charles had already died and it was becoming apparent that his nieces who were unmarried and quite a little older than his daughters, would have no children. He therefore directed in the Codicil that any portions of the trust estate which *"shall not be finally disposed of under said Will and this Codi-*

*cil*" should become a part of his residuary estate and be disposed of under item 12 of his will, which divided said residue equally between his wife and two daughters. They say that these considerations motivated his wording of said codicil where he said "if by reason of death or from other cause, any portion of said trust estate shall not be finally disposed of under said Will and this Codicil" then the same should pass under item 12 of the will.

The anti-lapse statute in effect now (Section 2107.52 Revised Code) and in effect when testator drew his will in 1904 and when he died in 1912 reads as follows:

"When a devise of real or personal estate is made to a relative of a testator and such relative was dead at the time the will was made, or dies thereafter, leaving issue surviving the testator, such issue shall take the estate devised as the devisee would have done if he had survived the testator. If the testator devised a residuary estate or the entire estate after debts, other legacies and devises, general or specific, or an interest less than a fee or absolute ownership to such devisee and relatives of the testator and such devisee leaves no issue, the estate devised shall vest in such other devisees surviving the testator in such proportions as the testamentary share of each devisee in the devised property bears to the total of the shares of all of the surviving devisees, unless a different disposition is made or required by the will."

It is the contention of the charities that item 3 of the codicil satisfies the requirements of the final words of the section "unless a different disposition be made or required by the will." In his codicil he might have made a similar provision to that for the heirs of John and Linas or he might have done nothing, in which case the anti-lapse statute would have operated but he did provide for an alternative in the case of the death of the named beneficiaries. Thus, Mary and Charles being dead when he made his codicil in 1910, a substitution was intended.

The "charities" likewise contend that the gift to his nieces, Clarissa C. Frackelton and Louise Frackelton, fails because they did not survive the time of distribution. Niece Louise died in 1912, Clarissa in 1952, his daughter Gertrude in 1953 and Constance in 1963. Applying the rule as stated in *Collier* v.

*Collier's Exrs.* (1854), 3 Ohio St. 369, and other cases that "the will and codicils must be read and considered together," it must follow that the two nieces must survive the life tenants for ten years to be entitled to take under the will.

Counsel for both sides of this question have written very excellent briefs in support of and opposed to the propositions stated above. The court would enjoy writing an analysis of the arguments made and the cases cited on both sides but in the interest of a prompt disposition of the case will confine himself to his conclusions and some of his reasons for them.

It is the opinion of the court that a man who was so definite as to details as the testator was would have revoked that part of item 9 of his will which gave the trust corpus to his collateral relatives in plain simple language when he drew his codicil in 1910 if that was his intention. He knew all the facts stated above, that Mary and Charles were dead and the nieces would in all probability die childless.

The testator stated in his will that he wished to provide for his wife and daughters for life and grandchildren in perpetuity, if he had any (and this was doubtful when he drew his codicil) but there is nothing about the codicil to indicate that if he had no grandchildren he wished to revoke the provisions made for people of his own blood in item 9 of his will. By way of an observation, which has nothing to do with the merits of the case, there was nothing in his will to indicate any overwhelming generosity on the part of the testator toward charities, having given nothing to charity out of a large estate.

The cases cited by counsel bear out the conclusion that a reference to people of his own blood includes collateral relatives as well as direct descendants. The court is of the opinion that testator's repeated use of that phrase is directed at his sons-in-law and not at his brothers and sisters and their children. The court approves the definition of the phrase "persons of my own blood" found in Black's Law Dictionary, Third Edition, which defines "blood" and kindred and relation from a common ancestor. "One person is 'of the blood' of another when they are related by lineal descent or collateral kinship." This text is supported by ample citation to case law.

This conclusion is also supported by a careful reading of Item 10 of the will which refers to the management of the trust in which the testator says:

"* * * and to keep the said property named and described in Items 6 and 7 (the trust estate) in persons of my own blood, as heretofore provided, to the end that the same shall not descend to the husbands of my said daughters, nor be controlled by either of them * * *."

This reference to persons of his own blood is used always in connection with the management of the trust and not with the distribution at the termination of the trust.

There was a valid reason for writing item 3 into his codicil. Item 9 of the will has no provision as to what happens to any of the one-fourth shares which should completely fail for want of qualified recipients. There is no provision that such a one-fourth would be divided among the other trust beneficiaries.

It was true in 1910 and now that legacies failing by lapse or otherwise will pass under a general residuary clause but the residuary clause in Mr. Chandler's will probably was not a general one. The following cases support that view, to wit: *Bane* v. *Wick* (1850), 19 Ohio 328; *Davis* v. *Davis* (1900), 62 Ohio St. 411; *Andrew, Exr.,* v. *Kling* (1910), 32 C. D. 639, 18 C. C. (N. S.) 134.

Therefore, to avoid intestacy as to any part of the trust, the testator had a valid reason for incorporating item 3 in his codicil. The court must assume that he wished to avoid intestacy.

"It is a settled rule of construction, that a testator is never presumed to intend to die intestate as to any part of his estate to which his attention seems to have been directed; and a court of equity will put such a construction upon equivocal words as to prevent such a result." *Collier* v. *Collier's Exrs.* (1854), 3 Ohio St. 369, at p. 373.

"(T)his rule of interpretation has been universally followed, not only by this court, but it is a rule which prevails in practically every other court." *Anderson* v. *Gibson* (1927), 116 Ohio St. 684, at p. 691.

The court is of the opinion that the words "not finally disposed of under said Will and this Codicil" are not properly construed by the charities in that they contend that this phrase imposes a condition of survivorship to the date of the expiration of the last life tenants and for 10 years afterwards on all of the named beneficiaries. The only case in which the trust corpus would not descend under item 9 of the will is one in

which the anti-lapse statute could not operate because of the nonexistence of persons qualified under the statute to receive it. Two cases are cited by the charities in support of their position, to wit: *In re: Phelps Estate* (1910), 147 Iowa 323, 126 N. W. 328; and *Wolley* v. *Paxson* (1889), 46 Ohio St. 307. The *Phelps case* differs from the instant case in that the *will provided for a substitution*, where because of death, the share did not go directly to the person named. In this case it was a brother who predeceased the testator and the brother's daughter was making claim to her father's share. The court said, at page 326:

"He gave to the residuary legatees all parts of his estate which for any reason did not go directly to the person named in the will,"

and again, at page 330:

"The will shows clearly that the testator intended to have his estate go to certain persons, and that he carefully provided for substitution where it might become necessary, and this without reference to or regard for the statute in question."

In the *Wolley* v. *Paxson case*, Judge Minshall in his opinion simply states the obvious that the testator could, if he wished, remove his will from the effects of the anti-lapse statute.

As against the above authority, we have numerous cases in Ohio and elsewhere construing wills where the operation of the anti-lapse statute was challenged and where the courts held it to be effective. Some of the citations follow. *Larwill's Exrs.* v. *Ewing* (1905), 73 Ohio St. 177; *Flynn, Admr.,* v. *Bredbeck* (1946), 147 Ohio St. 49; *Voss* v. *Voss* (C. P. 1955), 71 Ohio Law Abs. 577; *In re: Estate of Ferry*, 55 Cal. 2d 776, 361 P. 2d 900; *In re: Hutchinson's Will* (1954), 133 N. Y. S. 2d 249; *Lane* v. *Lane* (1961), 116 Ohio App. 100; *West* v. *Aigler, Admx.* (1933), 127 Ohio St. 370.

In the *Larwill case* the court says that the anti-lapse statute "is not to be averted except by language which clearly makes or requires a disposition different from that which its terms contemplate" and also that "stability and consistency of adjudication require that the conclusive presumption that the gift was made with knowledge of the (anti-lapse) statute and its effect. The language of the will in the instant case falls far short of these requirements."

Also in *West* v. *Aigler, supra,* the Supreme Court held that an estate was "finally" and fully disposed of "where the interests bequeathed were subject to the anti-lapse statute."

In the interest of brevity the court will refrain from quoting text writers on the subject but merely acknowledge what he believes to be their agreement with the law as stated in the above cases. Counsel for the charities place considerable dependence on Sec. 587 of Simes and Smith, Law of Future Interests. Counsel for Louise Shaw Dorr in their reply brief have analyzed the cases on which the above paragraph is based and demonstrated that the statement is hardly justified by the cases. They have also pointed out that Sections 585 and 594 of the same work contain a contrary rule or at least a rule more applicable to the present set of facts.

Another consideration favors the operation of the anti-lapse statute, to wit: that item 3 of the codicil speaks in the future, not of the past when it says "if by reason of death or from other cause." The testator knew that Mary and Charles were dead and his failure to revoke his bequest as to them indicates an intention to make no change as to them. If, in the future they should have no children to take their parent's share, then the share of such one would be disposed of as required by the codicil.

The same would be true if his nieces did not survive him or if John and Linas had no heirs surviving them. But whatever the event, the codicil looked to the future and not to the past.

### ISSUE II

Is the distribution of the trust property to be delayed for 10 years after the death of the last life tenant?

Item 9 of Mr. Chandler's will provides that distribution shall be made to his grandchildren if any are living ten years after the death of the survivor of the testator's wife and daughters, and then provides:

"* * * And in the event of the death of my said wife, and of both of my said daughters, without issue of my said daughters, or either of them, *living at the end of said period of ten years after the death of my wife and daughters aforesaid,* then and in that case, I give (to his sister Mary, one-fourth, brother Charles, one-fourth, nieces Clarissa and Louise, one-fourth),

and one-fourth *to the then living lineal descendants* of my brothers John T. Chandler and Linas C. Chandler. * * *''

Does this provision delay the distribution of the corpus for ten years after the death of the last life tenant, all of the life tenants having died without issue? The charities and trustee for unborn persons contend for the delay and all of the heirs oppose this view.

The charities go to considerable length in detailing why the testator provided for the 10-year delay and their reasons are probably valid if and only if the testator had grandchildren. Mr. Chandler for reasons not disclosed had a great aversion to having his sons-in-law come into control in any way of his fortune so in this item he repeated four times that distribution to his grandchild or grandchildren should be delayed for said 10-year period but in the opinion of the court he intended no such delay if there were no such grandchildren so that the bequests to his collateral heirs would become effective.

In the first place, the reason for the delay would no longer exist as the sons-in-law could gain no control of the property if it were distributed to the collateral heirs. It has been repeatedly said that his concern was for his wife and daughters but upon the death of all of them, that purpose had been served. The repetition of the phrase in question in the above quoted portion of item 9 preceding the words ''then and in that event'' related back to the previous provisions and if we are to construe the will by its four corners was never intended to control the distribution in event the corpus went as thereafter provided.

The emphasis in this item is upon the designation of the persons who are to take and not upon the time of distribution. In fact, the testator never at any time by any provision in his will made any definite provision for the termination of the trust. He says what his grandchildren shall take but not when. Even after the 10-year period apparently the property was to go into the possession of Robert J. Frackelton as trustee for such children and again later in item 9 they ''shall receive the entire property so left in trust'' but no definite statement of termination is made. If for any reason, good or bad, the testator intended to postpone the distribution for this 10-year period, he should have said as much and with his care as to

details, the court believes he would have said this in plain language, if that had been his desire.

Another indication that the testator had no intent to postpone the distribution to his collateral heirs is the fact that he made no provision for the distribution of income from the trust during said 10-year period. This is emphasized by the fact that he was very specific as to this same matter during the lives of his wife, daughters and grandchildren, if any. He does make reference to "unpaid income" in his bequests to Charles and his two step-brothers, but this provision is so indefinite as to supply no refutation to the above proposition. In contrast to this provision, he provides in item 7 of his will that the trustee pay out "at least semi-annually, or at such shorter periods as he may deem best, each, all and every of the income" and in item 9 he was very careful to provide who was to receive it. The court concurs in the reasoning of counsel for some of the heirs that in using the above quoted words preceding the bequest to collateral heirs, the testator was simply summarizing the first alternative bequest.

Again, the court adopts the suggestion that item 9 was intended to define the condition of the bequest to collateral relatives, not the time of making distribution. In defining the condition of the gift over he used two statements, one positive and the other negative: "if after the death * * * there shall be a child or children who shall survivie * * * ten years, then * * * I give * * * to such child * * *"; and, in reverse: "and in the event of the death * * * without issue of my daughters * * * living at the end of said period of ten years * * * I give * * * unto my sister * * *."

If there is any doubt as to the correctness of the subjective analysis above, the rules of construction announced by court decisions and text writers should finally determine the question.

The failure of a prior interest, there being no grandchildren, resulted in a present interest in the collateral beneficiaries. Restatement of the Law of Property, Vol. 2, Sec. 238. The failure of a prior interest, resulting in acceleration of a succeeding interest, may be due to a variety of causes, the most common of which is the renunciation by a widow of her right to take under her husband's will. The general rule applicable to such cases is stated in 5 Page on Wills (Bowe-Parker Rev.

118

1962), Sec. 47.45 and the rule is followed in Ohio. *Davidson* v. *Miners and Mechanics S. and T. Co., Exr.* (1935), 129 Ohio St. 418. The Supreme Court of Ohio refused to accelerate the remainder in the case of *Stevens, Exr.,* v. *Stevens* (1929), 121 Ohio St. 490. In this case the estate was to be liquidated upon the widow's death and the proceeds therefrom distributed to certain persons "if then living." The court found that contingent remainders could not be accelerated because the doctrine of acceleration of remainders is a rule of construction based upon presumptive intent. The court concluded that if the testator used such clear words of contingency, his expressed intent could not be varied by a rule of construction. Such words of contingency do not exist here.

In a later case, *Trustees of Kenyon College* v. *Cleveland Trust Co.* (1935), 130 Ohio St. 107, the Supreme Court concluded that acceleration would defeat not only the presumed but also the expressed intention of the testatrix. Incidentally this somewhat confusing state of the law as to acceleration of remainders has been cleared by the enactment of an amendment to Section 2107.39, Revised Code, effective October 16, 1953.

A case following the general rule and quite comparable with the facts in the instant case. Testator's wife was to have the income from a large farm and other property for a period of ten years after his death and then pass to his wife and children. She predeceased the testator and the court held:

"* * * As the death of the wife occurred before the death of the testator, the provisions for a ten year period never in fact came into existence, and is to be treated as though it had not been created. Under those circumstances, the principle of acceleration applies. * * *" In the present case, it is the opinion of the court that the provision for the ten-year waiting period must be treated as though it had not been created.

ISSUE III

The next issue to be determined is whether the title or ownership of the corpus of the trust is to be determined as of of death of the last life beneficiary, May 1, 1963. Again item 9 of the will, which contains the clause which determines this issue, reads in brief:

"And in the event of the death of my said wife and of both

of my said daughters, without issue of my said daughters, or of either of them, then and in that case, I give, devise and bequeath unto my sister * * *, one-fourth * * *; and to my nieces * * * one-fourth * * *; and one-fourth to my brother Charles * * *; and the remaining one-fourth * * * I hereby give and bequeath, share and share alike, to the then living descendants of my brothers John T. Chandler and Linas C. Chandler, their heirs and assigns forever.''

In the opinion of the court, there is no great problem as to the proper distribution of the first three-fourths but the last fourth to the descendants of his half-brothers is entirely different and poses problems very troublesome to the court. The court will first discuss the first three gifts which were made to named relatives.

The bequests to his sister Mary, his nieces Clarissa and Louise Frackelton and his brother Charles come squarely under the provisions of the anti-lapse statute (Section 2107.52, Revised Code). The courts of various states as well as various courts in Ohio have differed as to the name to be applied to the estate which was created for the children of testator's brother and sister and for his nieces. They have been designated as an alternative contingent remainder, a vested remainder subject to divestment, or as an executory bequest. It is the writer's opinion the preferable term is ''a vested remainder subject to divestment'' for the reason that it is the rule in Ohio that the law favors the vesting of estates at the earliest possible moment. *Ohio National Bank, Trustee,* v. *Boone* (1942), 139 Ohio St. 361; *First National Bank of Cincinnati, Exr.,* v. *Tenney* (1956), 165 Ohio St. 513; *Smith* v. *Weinkoff* (1947), 80 Ohio App. 206; *In re Estate of Hutchison* (1929), 120 Ohio St. 542; and *Cleveland Trust Co.* v. *Andrus* (1953), 95 Ohio App. 503.

There is no doubt that the anti-lapse statute does apply to the present facts. The statute was in effect in Ohio both on the day he executed his will and on the day of his death and he must be presumed to have full knowledge of the existence and the effect of the statute. The Supreme Court has so held in the following cases: *Larwill's Exrs.* v. *Ewing* (1905)), 73 Ohio St. 177; and *Flynn, Admr.* v. *Bredbeck* (1946), 147 Ohio St. 49.

Both testator's sister Mary and his brother Charles left issue who survived the testator. Therefore, the remainder in-

terests bequeathed to Mary and to Charles did not lapse. Instead, on January 1, 1912, William Bird Shaw was "substituted" for his mother, Mary J. H. Shaw, and Alice Chandler Ewing Clarke, Emily Chandler Dyer and Edith Chandler Huggins were "substituted" for their father, Charles E. Chandler. As of that date, William Bird Shaw took the entire remainder interest which his mother would have received had she survived the testator, that is one-fourth of the corpus of the trust estate and similarly, the remainder interest which Charles would have received was divided among his three daughters. Furthermore, the remainder passed to the above named children "as legatees and devisees directly under the will of the testator * * *. Such substituted devisees or legatees do not take by representation, but as substituted beneficiaries, as though they had inherited directly from the testator." 96 C. J. S. 1059, Wills, Par. 1217. The fact that the bequests under consideration were vested subject to being divested by the birth of grandchildren of the testator does not affect the operation of the anti-lapse statute. As stated in 96 C. J. S. 1058, Wills, par. 1217, in Ohio:

"* * * the anti-lapse statute saves a gift to a relative who dies leaving issue before his gift becomes vested whether before or after the death of the testator."

This text is supported by many cases including: *Voss* v. *Voss* (C. P. 1955), 71 Ohio Law Abs. 577; *In re Hutchinson's Will* (1954), 122 N. Y. S. 2d 249; *Lane* v. *Lane* (1961), 116 Ohio App. 100; *Larwill's Exrs.* v. *Ewing* (1905), 73 Ohio St. 177; and *West* v. *Aigler* (1933), 127 Ohio St. 370.

As to testator's nieces, Louise and Clarissa Frackelton, the question of the anti-lapse statute does not arise because both survived the testator. Louise died June 26, 1912 and Clarissa survived until Dec. 11, 1952. However, they share with the children of Mary and Charles the objection that they did not survive the last life tenant who did not die until May 1, 1963. As to the above legatees, there was no condition of survival stated in the will other than the general provision already discussed and found by the court not to apply to these bequests. The court does not consider it necessary to belabor his opinion that survival by these beneficiaries of the life tenants is not necessary. The rule is stated in Restatement of Property

Par. 255; also in Simes and Smith "Law of Future Interests" Par. 581 where it is stated that:

"Where the requirement of survival is found to exist, it is usually applicable only to the first named takers (issue of testator's daughters). The persons who are the alternative takers need not survive unless such a requirement is specifically expressed."

Also see Par. 549 of Simes and Smith for a more complete statement of the same rule.

Having arrived at the conclusion that the remainder interests did in fact vest on January 1, 1912, in William Bird Shaw, Alice C. Clarke, Emily Dyer, Edith Huggins, Louise and Clarissa Frackelton, subject only to being divested by the birth of grandchildren which did not happen, the question next arises as to what happens to these bequests since none of these persons is now living. The answer is made plain by the statutory law of Ohio. Section 2131.04, Revised Code provides:

"Remainders, whether vested or contingent, executory interests, and other expectant estates are descendable, devisable and alienable in the same manner as estates in possession."

Although this statute was not enacted until 1932, it is clear that it simply codifies the existing common law in this state. See: *Moore, Trustee,* v. *Foresman* (1962), 172 Ohio St. 559; and *First National Bank of Cincinnati, Exr.,* v. *Tenney* (1956), 165 Ohio St. 513.

The next step is to trace the various interests as they descend either by will or intestate succession from holder to holder. Taking the beneficiaries in the order named in the will, the court will first consider the share devised to Mary J. H. Shaw. Having predeceased the testator, her one-fourth share vested in William Bird Shaw. He died testate in Hot Springs, Arkansas, on Aug. 4, 1927, and by will left the residue of his property to his surviving spouse, Mary B. Shaw. She did not remarry and died testate in Illinois on April 13, 1939, leaving two children, Mrs. Otto Dorr and Harold Bird Shaw. She left the residue of her estate to the two children in equal shares for life. Presumably the remainder after the life estates descended by intestate succession to the same two children. Harold Bird Shaw then died on June 23, 1953, without children but survived by his widow, the defendant, Anna Marea Shaw. He

left a document purporting to be a will in which he left the residue of his estate to his wife. His widow apparently accedes to his interest, whether by testate or intestate succession. The court finds that Louise Shaw Dorr (a. k. a. Mrs. Otto Dorr) and Anna Marea Shaw are each entitled to a distribution to them of one-eighth of the trust estate.

The second beneficiaries are the daughters of his sister Maria Louise Frackelton, Clarissa C. and Louise Frackelton. Louise did not marry and died testate June 26, 1912, leaving the residue of her property to her sister, Clarissa Frackelton. Clarissa Frackelton never married and died testate Dec. 11, 1952, in Menard County, Illinois. By her will she left the residue of her estate to her brother, David W. Frackelton. David W. Frackelton died testate June 24, 1959, in Cuyahoga County, Ohio, and he in turn left his estate in trust with the defendant, The Cleveland Trust Company, as trustee. The court therefore finds that the Cleveland Trust Company, as trustee under the will of David W. Frackelton, is entitled to a distribution of one-fourth of the trust estate.

The third beneficiary, Charles E. Chandler, died before the testator and left three daughters, Edith C. Huggins, Emily C. Dyer and Alice C. Ewing Clarke, all of whom survived the testator who were invested with their father's one-fourth share of the trust estate on January 1, 1912, again being subject to being divested, which did not occur.

Edith C. Huggins died intestate on December 18, 1932, leaving no surviving husband and four children, Harrison D. Huggins, Charles D. Huggins, Chester C. Huggins and Eloise H. Haines. Edith had a 1/12th interest in the entire trust estate of which each of her children inherited from her an undivided 1/48th interest in the whole. Her sons Harrison D. Huggins and Chester C. Huggins are living and are entitled to 1/48th each. Eloise Haines and her husband executed a community property agreement which provided that any and all property belonging to either of them upon death, would become the property of the survivor. She died and this agreement was recognized as valid in Washington, the state of her death. Her husband, Frederick S. Haines, remarried and he died survived by his second wife, defendant Ida Marie Haines, and by his son, defendant Frederick S. Haines III. The agreed statement of

facts recites that he left a document purporting to be his will which by its terms bequeathed the residue of his estate to defendant Ida Marie Haines, but the document was never offered for probate.

However, Ida Marie Haines, widow of the late Frederick S. Haines, Jr., executed an assignment on June 25, 1964, of all her interest in the Chandler estate to Frederick S. Haines III (Defts. Exhibit C). He is therefore entitled to his father's 1/48th interest in the total trust estate.

Charles N. Huggins, the fourth child of Edith C. Huggins, died intestate in Oregon in 1939. Under the Oregon statute of descent and distribution then in effect, one-half of his property descended to his wife, Ruth Huggins (now, by remarriage) Hollister. The other one-half descended to his two children, Charles N. Huggins, Jr., and Ruth M. Slack, in equal shares. Accordingly, the fractional shares of these defendants are as follows: Ruth Huggins Hollister, one-half of 1/48th, or 1/96th. Charles N. Huggins, Jr., and Ruth M. Slack each received one-fourth of 1/48th, or 1/192nd. (Oregon Code Annotated, Section 10-102 Par. 4. See Deft's. Exhibit D.)

Emily C. Dyer died intestate in Dallas, Texas in 1932, survived by her husband, Henry C. Dyer and seven children: Cordelia S. McGuire, Francis Bernard Dyer, Paul Dyer, Charles Jack Dyer, Helen Henrich, Anne Laurie Lewis and Henry C. Dyer, Jr. Under the Texas statute of descent and distribution then in effect, 1/3rd of her property descended to her husband and the remaining 2/3rd to her seven children in equal shares.

Cordelia S. McGuire, Paul Dyer, Helen Hendrich and Annie Laurie Lewis are all living and each is entitled to 1/7th of 2/3rd of 1/12th, or 1/126th of the trust property.

Henry C. Dyer, husband of Emily, died in 1928 and bequeathed his entire estate to his son Francis Bernard Dyer and accordingly Francis became entitled to his own 1/126th plus his father's 1/36th or a total of 1/28th of the trust property. Francis Bernard Dyer died intestate in Vermont in 1960 and his estate is still in the process of administration. Arline J. Dyer, as his administratrix, is now entitled to said 1/28th interest.

Charles Jack Dyer, who inherited a 1/126th interest from his mother Emily died September 30, 1953, in Shelton, Wash-

ington, leaving a will in which he devised his estate to this wife, Virginia Dyer. However, his will was executed prior to the birth of his three children. Under the Washington pretermitted heir statute in effect at the time of his death said children are entitled to half of his estate. Charles Jack Dyer, Jr., Paul Albert Dyer and Mary Virginia Dyer, his children are therefore each entitled to a 1/756th interest and his widow, Virginia Dyer (now, by re-marriage) Dundas, a 1/252nd interest.

Henry C. Dyer, son of Emily, died in Portland, Oregon, November 8, 1956, survived by his wife, Georgia E. Dyer, and by his daughter, Ann Dyer Robertson. The agreed statement of facts recites that a document purporting to be his will, which by its terms left the residue of his estate to his surviving wife had been filed with the Probate Court of Multnomah County, Oregon, but not probated. Counsel for the widow, Georgia E. Dyer assert in their brief that she has now been appointed executrix of the estate of her deceased husband. If so, his 1/126th share should be distributed to her as such executrix. If she has not been appointed, distribution will have to be held up until a fiduciary is appointed and then paid to him.

Alice Chandler Ewing Clarke was married first to William B. Ewing and then to Charles C. Clarke, both of whom predeceased her. Alice had three children by William B. Ewing: Mary E. Chaffe, Robert M. Ewing and William B. Ewing, III. She had one child by Charles C. Clarke, Margaret Clarke Caracciolo di Castagneto (also di Melito). Alice died testate in Florence, Italy, January 29, 1926. Her will was admitted to probate by the Probate Court of Peoria County, Illinois. In item 5 of her will she left the residue of her property which includes the property in question in equal parts to Mary E. Chaffe, Robert M. Ewing and William B. Ewing III.

Mary E. Chaffe died testate in New Orleans, La., on March 14, 1939, leaving a husband, Henry H. Chaffe, but no children. She left the portion of her estate here in question to the three children of her sister, Margaret di Melito, to wit: Carlo Caracciolo, Marello Agnelli and Nicola Caracciolo, share and share alike. This gift was subject to a life estate of her two brothers, but they are now both deceased. From this source then said three children acquired a 1/108th interest each.

William B. Ewing III, never married and died testate in

Oakland, California, on April 19, 1948. By his will he left his 1/36th share of this estate to the said three children of his sister, Margaret. By this bequest they each acquired another 1/108th of the trust estate. Carlo Caracciolo, Marella Agnelli, and Nicola Caracciolo therefore are each entitled to a total of a 1/54th share of the trust estate.

Robert M. Ewing died testate in Peoria, Ill., on Dec. 27, 1943. His will and codicils were admitted to probate by the Probate Court of Peoria County, Ill. By his will he left the residue of his estate to his surviving spouse Hazel Ewing "for and during the term of her natural life" and after her death "such part thereof, if any, that shall not have been used" by his wife to his son, the defendant William B. Ewing, IV. Robert M. Ewing had no child of his body but was survived by his adopted son, William B. Ewing, IV. He was duly adopted in Yakima County, Washington, on May 23, 1921. It is the opinion of the court that the 1/36th interest of Robert M. Ewing should be delivered to Hazel Ewing. It is apparent that Robert M. Ewing did not impose any trust on the life estate and only such part as has not been used passed on to their adopted son, William B. Ewing, IV. The testator had a perfect right to leave the residuary estate to anyone he chose and the fact that William was his adopted son has no bearing whatever on the matter.

Coming now to the fourth bequest found in Item 9, an entirely different condition prevails. As to the first three the court has expressed the opinion that the words "then and in that case" refers back to the opening words of the entire clause providing for alternate beneficiaries: "And in the event of the death of my wife and of both of my said daughters, without issue of my said daughters * * *." He was only stating a condition precedent to the gifts to follow and not a time of vesting. He proceeded to make the first three bequests with no limitation of time of vesting and therefore the gifts vested immediately upon his death, subject only to being divested by the birth of grandchildren. But in the fourth gift, he gave the remaining one-fourth to the *then* living descendants of his brothers John and Linas. The word *then* used here can import nothing but time and this time can refer to nothing but the time of death of his last surviving daughter without issue.

Therefore, while the members of the first three classes take as substitute legatees, those claiming through John and Linas cannot be determined until the happening of the event which makes the bequest effective, to wit: May 1, 1963.

John T. Chandler had one daughter, Myrtis Chandler Calkins, who died March 18, 1936. She had no children but adopted William Julian Calkins on Jan. 4, 1906, at Deadwood, South Dakota. He is still living and has three children, John Charles Calkins, Rose Marie Calkins, both minors, and William F. Calkins. William was adopted on February 8, 1939, at Colbran, Colorado by William Julian Calkins and his first wife.

Linas C. Chandler died Dec. 18, 1897, survived by William Child Chandler, Carl Beane Chandler and Ellen C. Ott. Both William and Carl died prior to 1963 without issue. Ellen C. Ott died October 13, 1959, survived by one daughter, Josephine Louise Ott, a defendant herein.

As between the above named second cousins, William Julian Calkins and Josephine Louise Ott, the first issue to be determined is whether William comes within the provisions of the will which restricts the bequest to the *"lineal"* descendants of the two brothers. By delaying the vesting of this portion of his estate to time far in the future, the testator is presumed to have known that the law in effect at the time of vesting would determine the members of the class. If he did not wish this to be so, he must have clearly so indicated in his will. The only argument advanced that he so indicated is drawn from references in his will to persons of "my own blood." The court has already found that this phrase was intended to apply only to his sons-in-law in connection with the control of his estate in the event he had grandchildren.

The case of *Tiedtke, Exr.*, v. *Tiedtke* (1952), 157 Ohio St. 554, is authority for the proposition that where a testator indicates his intention that the heirs should be determined at the date of the expiration of a life interest, the statutory law in effect at such date shall be applied in determining such heirs of the testator, unless the provisions of his will or surrounding circumstances indicate a contrary intention, and even though such statutory law at the termination of the life estate will permit an adopted child of the testator's daughter to take and the statutory law in effect at the time of testator's death would

not have so permitted such adopted child to take. Also see *Cook* v. *Crabill* (1959), 110 Ohio App. 45.

On May 1, 1963, William Julian Calkins was a "lineal descendant" of the testator under Ohio law. Section 3107.13, Revised Code, then and now in effect reads in relevant part, as follows:

"* * * For all purposes under the laws of this state, including without limitation all * * * wills governing inheritance of and succession to real or personal property * * *, a legally adopted child shall have the same status and rights, and shall bear the same legal relationship to the adopting parents as if born to them in lawful wedlock and not born to the natural parents; * * *."

It has been settled in Ohio since *Flynn* v. *Bredbeck* (1949), 147 Ohio St. 49, that this statute enables adopted children "to inherit through as well as from an adopting parent, whether such property passes by will or by operation of law." Since William Julian Calkins can inherit through Myrtis Chandler Calkins, he is a "lineal descendant" of the testator.

The case of *Commerce Trust Co.* v. *Weed* (Mo. 1958), 318 S. W. 2d 289, discussed the term "lineal descendants" in a similar case and arrived at the above conclusion.

So far as the court can tell, there is no opposition to the proposition that the law of Ohio applies even though the child was adopted in South Dakota, where the laws as to inheritance by adopted children may not be as liberal. It is the opinion of the court that the Ohio law controls.

The only remaining question is whether the term used in the will that the descendants shall "share and share alike" requires that the three children of William be included as descendants so that this share of the estate be split five ways, or not so treated, and the share split evenly between William and Josephine Louise Ott.

The cases on this question are in great confusion, the older cases holding that all five would share equally. This stemmed from a peculiar situation in England and was carried to the American courts. It is stated in Powell on Real Property, Part 3, Par. 370, that:

"This rule has had some persistent following in the United States. For the most part it has been abandoned in this country,

either by constructional devises or by statute, in favor of a rule which distributes the subject matter of the class gifts to such members of the class, and in such shares as they would receive, under applicable law of intestate succession if B had died intestate at the moment of the final ascertainment of the class membership, owning the subject matter of the class gift.''

The per capita rule was followed in New York until a statute was passed abrogating the rule and there were even some decisions after the enactment of the statute but in the case of *In re: Libby's Estate* (1954), 134 N. Y. S. 2d 839, the court, after reviewing the history of the law, held that a gift to descendants requires a per stirpes distribution.

The American Law Institute in Restatement of the Law of Property, Future Interests, Parts 3 and 4, Par. 303, summarizes the current law at length. Of particular interest is the statement in subsection E.

''e. *Operation of the stated rule—Exclusion of descendant having living parent.* When the living issue of B consist of one or more children of B and one or more grandchildren of B, who are children of a living child of B, such grandchildren are wholly excluded from sharing in the distribution of the subject matter of the class gift unless a 'contrary intent of the conveyor is found from additional language or circumstances.' This is the situation in which the rule stated in this Section aids in determining the ultimate class membership as well as in distributing the subject matter of the gift. More remote descendants of B, who have a living parent or grandparent able to share in the disposition, are similarly excluded.

''The propriety of construing a limitation so as to exclude descendants having living parents is strengthened by any language or circumstances indicating the desire of the conveyor for an equality of distribution as between the stirpes descendant from B.''

The above rule has been followed in Ohio in the case of *Watson* v. *Watson* (1929), 34 Ohio App. 311, where the devise was to testator's daughter for life, ''and at her death to the issue of her body then living.'' There were four surviving children, and two children of a deceased child. The Court held a per stirpes distribution was required, stating, p. 315:

''* * * It has been held in a number of other jurisdictions

that a *per capita* distribution should be applied. On the other hand, in Massachusetts the word 'issue' is regarded as importing representation. A number of reasons suggest themselves to support the Massachusetts rule. 'The law favors an equal distribution of an estate among the children of the deceased owner; and it favors a distribution between near and remote heirs *per stirpes* in preference to *per capita.*' *Kilgore* v. *Kilgore*, 127 Ind., 276, 26 N. E., 56.

"This policy finds expression in the statute law of Ohio. Sections 8581 to 8584, General Code. The rule above referred to as applied in some jurisdictions permits children to compete with their parents in the distribution of the estate. This is in conflict with the normal human feeling of equality. It is more just for distribution to be according to stock, rather than by the persons. * * *"

The law of Ohio as applied to intestate succession requires a per stirpes distribution in all instances. See Sections 2105.06, 2105.12 and 2105.13, Revised Code. Thus, under the above statutes, if the property were descended by intestate succession there would be no question as to its being divided equally between the two second cousins or if William Julian Calkins were not living, his share would go to his three children. Granted, this property is not descending by intestate succession, but the fact that the statutory law has made the above provision indicates what the legislature of this state considered to be the fair and equitable rule so far as they could control the distribution of inherited property and is a disavowal of the per capita rule.

In many cases involving this problem, the court looks to the intent of the testator. Certainly the whole pattern of testator's will shows a meticulous adherence to the per stirpes pattern. This appears in his provision for his daughters and their children, if any, for the daughters of his sister, Maria Louise Frackelton, by the gift of one share to each of his brothers, a sister and a share to his two half brothers. At the time he executed his will, his sister Mary had but one child and his brother Charles had three, Linas had three children and John had but one. All four siblings had died when he made his codicil but he did not change the pattern.

Counsel for the children of William Julian Calkins cite

130

the case of *Mooney, Gdn.,* v. *Purpus* (1904), 70 Ohio St. 57, where the will directed that the residuary estate was to be "divided equally amongst my lawful heirs, share and share alike." There were five living children and one deceased child with two surviving children. The court held that "equally divided amongst my lawful heirs" required a per capita distribution. This is a strong case in his favor but in the light of the pattern established by testator's will in this case, it is the opinion of the court that it should not control in this case.

A good review of the law on this point and the reason for it is found in the case of *Lea* v. *Lea* (1922), 145 Tenn. 693, 237 S. W. 59. It is incorporated here by reference only. Another similar statement is found in Page on Wills, Par. 36.10 at pg. 563-64 (1961). Also, the Court of Appeals of Woods County did not follow the *Mooney case* in the case of *Stearns* v. *Brandezerry* (1918), 9 Ohio App. 300. And again the Supreme Court did not cite or discuss *Mooney, Gdn.,* v. *Purpus* in the similar case of *Godfrey* v. *Epple* (1919), 100 Ohio St. 447, but they held for a per stirpes distribution. To the same effect is *Gill* v. *Alcorn* (1924), 19 Ohio App. 122.

Since the court is of the opinion that the two second cousins take per stirpes, the children of William Julian Calkins are not entitled to a part of the distribution of the corpus of the trust estate but the said William Julian Calkins and Josephine Louise Ott are each entitled to a one-eighth interest.

*Judgment accordingly.*